FILED

FEB 0 6 2015

U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301

**JEFFREY A. PHILLIPS,**
    **Plaintiff,**

**v.**
                    **Civil Action No. 2:14CV67**
                    **(The Honorable John Preston Bailey)**

**COMMISSIONER OF SOCIAL SECURITY,**
    **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Jeffrey A. Phillips ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

On August 28, 2009, Plaintiff filed an application for DIB, alleging disability since June 11, 2009. On June 13, 2011, Administrative Law Judge ("ALJ") Mark Swayze entered a decision finding Plaintiff was not disabled (R. 91-105). On August 9, 2011, the Appeals Council denied Plaintiff's request for review (R. 110-12). Plaintiff filed another application for DIB on July 6, 2011, again alleging disability since June 11, 2009, due to rheumatoid arthritis, diabetes, and depression (R. 168-69, 199). Plaintiff's applications were denied at the initial and reconsideration levels (R. 116-20, 126-28). Plaintiff requested a hearing, which ALJ Regina Carpenter held on April 2, 2013 (R. 35-59). Plaintiff, represented by counsel, Brian Bailey, testified, as did Vocational Expert

("VE") Larry Bell (R. 35). On April 15, 2013, the ALJ entered a decision finding Plaintiff was not disabled (R. 14-29). On July 7, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-5).

## II. STATEMENT OF FACTS[1]

Plaintiff was born on April 23, 1964, and was forty-eight (48) years old at the time of the administrative hearing (R. 42, 168). He received his high school diploma in 1982 and has past relevant work as a school custodian (R. 200).

Plaintiff saw Dr. Muhammad Salman on June 20, 2011. He reported that his medications were "working well" and that he needed refills. Dr. Salman noted that Plaintiff's had a "casual/neat" and appropriate appearance. He was oriented as to person, place, date, and time, and was cooperative. Plaintiff did not show any psychomotor retardation or agitation, and he did not present with any suicidal or homicidal thoughts. Plaintiff described his mood as "good." Dr. Salman noted a euthymic affect, clear speech, appropriate thought content, and normal memory (R. 476).

On July 26, 2011, Plaintiff completed a Function Report–Adult. At least once a week, Plaintiff's depression caused him to stay in bed and not be able to function (R. 206). On a typical day, Plaintiff provided food and water for his cats, gave insulin to one cat, watched television, and read the newspaper. Plaintiff could not sleep if he did not take his one medication for depression. He had no problems with personal care (R. 207). Plaintiff prepared meals daily; he prepared

---

[1] As noted above, Plaintiff's previous claim was denied by ALJ Swayze on June 13, 2011. The Appeals Council denied review on August 2, 2011. "The Appeals Council's decision, or the decision of the administrative law judge if the request for review is denied, is binding unless you or another party file an action in Federal district court, or the decision is revised." 20 C.F.R. § 404.981. Neither of those conditions occurred, making the June 13, 2011 decision a binding decision. Accordingly, the undersigned has only included that medical evidence which is dated subsequent to June 13, 2011.

sandwiches, soups, and hot dogs. Plaintiff needed to watch what he ate because of his diabetes. He was able to mow the lawn using a riding mower; he did this once a week and it took him half an hour. If Plaintiff was not feeling well, his wife took care of the lawn and weed eating (R. 208). Plaintiff went outside "most days;" he could drive and ride in a car, and go out alone. Plaintiff shopped for groceries once a week for fifteen (15) to thirty (30) minutes at a time. He could pay bills, count change, handle a savings account, and use a checkbook and money orders (R. 209). Plaintiff's hobbies included reading and watching television; he did those on days when his depression did not keep him in bed. Plaintiff went to church once a week; he did not spend time with others (R. 210). His depression caused problems with his ability to get along with others; on those days, he tried not to associate with others. Plaintiff could walk fifty (50) yards before needing to stop and rest for five (5) to ten (10) minutes. He could not follow written and spoken instructions well, and he could only pay attention for "short spans" (R. 211). Plaintiff did not handle stress and changes in routine well; at times, he felt like he did not want to live (R. 212).[2]

On August 20, 2011, Debra Lilly, Ph.D., completed a Psychiatric Review Technique of Plaintiff. She determined that Plaintiff's affective disorder was major depression (R. 486). Plaintiff was moderately limited in his activities of daily living, his ability to maintain social functioning, and his ability to maintain concentration, persistence, or pace. He had not experienced any episodes of decompensation (R. 493). Dr. Lilly noted that Plaintiff was not "totally credible" (R. 495). She also completed a Mental Residual Functional Capacity Assessment of Plaintiff. In that, Dr. Lilly found that Plaintiff was moderately limited in his abilities to understand and remember detailed

---

[2] Plaintiff completed another Function Report–Adult on December 3, 2011; this report substantially mirrored the one completed on July 26, 2011 (R. 223-30).

3

instructions, carry out detailed instructions, and maintain attention and concentration for extended periods (R. 497). Plaintiff was also moderately limited in his abilities to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Dr. Lilly also noted that Plaintiff was moderately limited in his abilities to respond appropriately to changes in the work setting and set realistic goals or make plans independently of others (R. 498). In sum, Dr. Lilly determined that Plaintiff needed to perform "simple, routine, and repetitive tasks in a low stress environment defined as having only occasional decision making required, and only occasionally changed in the work setting which also requires no more than occasional interaction with the public, supervisor(s), and co-workers" (R. 499).

Plaintiff saw Dr. Salman on September 19, 2011, for a medication change. He had been experiencing depression and anxiety. Plaintiff had a "hopeless feeling;" his energy had become "better." Plaintiff was cooperative and oriented as to all spheres. He displayed no signs of psychomotor retardation or agitation. Plaintiff did have suicidal thoughts without plans. Dr. Salman noted that Plaintiff's suicidal thoughts had decreased since his Deplin dosage had increased. He still had "passive" suicidal ideations; he experienced "fleeting" thoughts, sometimes three (3) times per week. Plaintiff's affect was sad; he had clear speech, appropriate thought content, and normal memory. Dr. Salman diagnosed major depressive disorder and prescribed Remeron, Abilify, Cymbalta, and Deplin. Plaintiff's Cymbalta dosage was decreased. He told Dr. Salman that he would keep himself safe and go to an emergency room if his suicidal thoughts changed (R. 521).

On September 22, 2011, Dr. Bennett Orvik completed a consultative examination of Plaintiff. Plaintiff previously worked as a school custodian; he last worked two (2) years ago. He was "going

to be on disability through the State of West Virginia on a long-term basis." Dr. Orvik noted Plaintiff's history of osteoarthritis, diabetes, mellitus, and depression. Plaintiff's diabetic control was "usually fairly good" (R. 501). He still had a "lot" of arthritic pain. Plaintiff took four (4) medications for his depression and saw a psychiatrist on a regular basis. His depression was "fairly well controlled" when he took all his medication. Physical activity made his arthritis worse. Plaintiff felt that he could not work because he had "too much arthritic pain and too much depression." His arthritis pain was located in his feet, hands, back, and shoulders; the pain was "aching" and "sometimes sharp." Plaintiff rated his pain as "anywhere from 4 to 8 on a scale of 0 to 10." Medication helped the pain "fairly significantly" (R. 502).

Upon examination, Dr. Orvik noted that Plaintiff had multiple scars on his arms and legs where Plaintiff claimed he got "infected areas with his diabetes." Plaintiff was mildly obese; his behavior was "generally consistent with allegations of disability" (R. 503). Plaintiff claimed to have some numbness in both of his feet; his muscle strength in his arms and legs was 5/5. Deep tendon reflexes were "faint to absent" in his bilateral knees and ankles. Plaintiff had a normal straight leg raise test in both the sitting and supine positions. As for range of motion, Plaintiff's grip strength was "mildly decreased on grade 4/5." Plaintiff had a normal stance; his gait showed a "slight left-sided limp." He could tandem walk "fairly well;" Plaintiff could walk on his heels but not on his toes. Plaintiff was only able to do half a squat but arose from a partial squat without difficulty. He did not have trouble getting in and out of a chair or on and off the examination table. Plaintiff reported that he sometimes experienced trouble "dressing and undressing with regard to his shirt" and with picking up small objects with his right hand (R. 504).

Dr. Orvik diagnosed insulin-dependent diabetes mellitus, diabetic neuropathy, depression,

osteoarthritis, exogenous obesity, hypertension, and hyperlipidemia. He opined that Plaintiff's treatment, including an insulin pump, appeared to be appropriate. Dr. Orvik noted that Plaintiff's main complaint was "psychiatric in nature;" he was on a "large amount" of psychiatric medication. As for limitations, Plaintiff stated that he could stand for "about half an hour, then has to move around because of leg pain." He could only walk for about 100 yards before his feet hurt. Plaintiff could lift and carry about twenty (20) pounds; he was "sometimes unsure" about handling objects with his right hand. Dr. Orvik noted that a "psychological evaluation should probably be helpful in determining his degree of possible disability relating to depression" (R. 505).

Thomas Lauderman, DO, completed a Physical Residual Functional Capacity Assessment of Plaintiff on September 28, 2011. Plaintiff could occasionally lift and carry twenty (20) pounds; frequently lift and carry ten (10) pounds; stand, walk, and sit for about six (6) hours in an eight (8)-hour workday; and was unlimited with pushing and pulling (R. 510). He could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; he could never climb ladders, ropes, or scaffolds (R. 511). Dr. Lauderman determined that Plaintiff needed to avoid concentrated exposure to extreme cold and heat and even moderate exposure to hazards (R. 513). He agreed with ALJ Swayze's June 13, 2011 decision that Plaintiff could perform light work (R. 515).

On October 17, 2011, Plaintiff saw Dr. Salman for depression, anxiety, mood swings, and "not too much" irritability. He had "poor focus" because of his depression. Plaintiff was cooperative and oriented as to all spheres; he had good eye contact and coordination. Plaintiff displayed no signs of psychomotor retardation or agitation. He had "very little" suicidal thoughts; his suicidal thoughts had decreased with the decrease in his Cymbalta dosage. Plaintiff described his mood as "about half;" he had a euthymic affect and normal memory. Dr. Salman prescribed

Remeron, Abilify, and Cymbalta; Plaintiff was given samples of Deplin (R. 520).

Plaintiff saw Dr. Salman again on November 14, 2011, for his depression. Plaintiff reported an improvement; he had experienced no suicidal thoughts. His motivation had improved; he was looking forward to Thanksgiving with his family. Plaintiff was cooperative and oriented as to all spheres. He displayed no signs of psychomotor retardation and agitation; he denied suicidal thoughts. Plaintiff described his mood as "ok;" his affect was sad. Plaintiff had clear speech, appropriate thought content, and impaired short term memory. Dr. Salman diagnosed major depressive disorder and prescribed Remeron, Abilify, Cymbalta, and samples of Deplin (R. 519).

On December 13, 2011, Plaintiff told Dr. Salman that he continued to have some difficulty with depression, especially because of the holidays. Plaintiff's affect was constricted and sad because of his inability to work. Dr. Salman prescribed Remeron, Abilify, and Cymbalta. He noted that Plaintiff was provided with supportive therapy regarding his "inability to work due to his emotional issues." Dr. Salman thought that Plaintiff remained at "high risk to relapse under stressful circumstances . . . and remain[ed] unable to have a gainful employment" (R. 518).

Plaintiff returned to see Dr. Salman on January 11, 2012, for a routine appointment. Plaintiff reported continuing anxiety and depression; his mood had improved since his last appointment. He still had difficulty being around crowds in the grocery store and other places. Dr. Salman noted that Plaintiff had an appropriate appearance, was cooperative, and was oriented as to person, place, date, and time. Plaintiff did not display any psychomotor retardation or agitation; he had no suicidal or homicidal thoughts. He had clear speech, a euthymic mood, and appropriate thought content. Dr. Salman found that Plaintiff's short term memory was impaired. He continued Plaintiff on his current medications since Plaintiff was "stable" (R. 517, 600).

On January 31, 2012, Frank Roman, Ed.D., completed a Psychiatric Review Technique of Plaintiff. Plaintiff suffered from a mood disturbance, "accompanied by a full or partial manic or depressive syndrome," evidenced by psychomotor agitation or retardation, decreased energy, and feelings of guilt or worthlessness (R. 531). He also had an anxiety-related disorder evidenced by a "persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity, or situation" (R. 533). Dr. Roman noted that Plaintiff was mildly restricted in activities of daily living but moderately restricted in maintaining social functioning, concentration, persistence, and pace (R. 538). He thought that Plaintiff was credible and "remains capable" (R. 540). Dr. Roman also completed a Mental Residual Functional Capacity Assessment. Plaintiff was moderately limited in his abilities to carry out detailed instructions, maintain concentration and attention for extended periods, and work in coordination with or proximity to others without being distracted by them (R. 542). Plaintiff was also moderately limited in his abilities to interact appropriately with the public, accept instructions and respond appropriately to criticism, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes (R. 543). Dr. Roman agreed with ALJ Swayze's June 13, 2011 decision (R. 544).

On January 31, 2012, Dr. Narendra Parikshak reviewed Dr. Lauderman's September 28, 2011, Physical Residual Functional Capacity Assessment and affirmed same (R. 546).

On February 8, 2012, Plaintiff saw Dr. Salman for a routine appointment. He did not have much "desire to do a whole lot." His energy level was low; he felt depressed "50% time." Plaintiff was experiencing hypersomnia; he slept about ten (10) to twelve (12) hours per day. Upon examination, Dr. Salman noted that Plaintiff had good eye contact and coordination; he was cooperative; he was oriented as to all spheres. Plaintiff had no signs of psychomotor retardation or

agitation; he had no suicidal or homicidal thoughts. His affect as euthymic; he described his mood as "not too bad–some bouts of depression." Plaintiff had clear speech, appropriate thought content, and normal memory. Dr. Salman diagnosed major depressive disorder and indicated that Plaintiff would receive individual therapy (R. 599).

Plaintiff told Dr. Salman, on March 7, 2012, that he had not had any changes in mood. Upon examination, Dr. Salman noted that Plaintiff was cooperative and oriented as to all spheres. He had no signs of psychomotor retardation or agitation; he had no suicidal or homicidal thoughts. Plaintiff described his mood as "half;" his affect was euthymic. He had clear speech and appropriate thought content. Dr. Salman diagnosed major depressive disorder; Plaintiff denied any side effects from his medication (R. 598).

Plaintiff saw Dr. Syad Haq on April 4, 2012 for a follow up for his diabetes, hypertension, hyperlipidemia, and bipolar disorder. Plaintiff reported that his hypertension was "well controlled" (R. 548, 570). Dr. Haq noted a normal examination and diagnosed diabetes mellitus, hyperlipidemia, hypertension, and bipolar I disorder single manic episode severe specified as with psychotic behavior. He prescribed an insulin regimen, Lantus, and Apidra, and instructed Plaintiff to return in two (2) weeks (R. 549-50, 571-72).

Plaintiff saw Dr. Salman again on April 4, 2012. He reported that his blood sugar had increased; he had increased depression and anxiety. Plaintiff thought his blood sugar increased with increased anxiety. He was maintained on two (2) different insulin doses. Dr. Salman added Buspar to Plaintiff's medications and noted that he would try to contact Dr. Haq about Plaintiff's blood sugar (R. 597).

On April 18, 2012, Plaintiff returned to see Dr. Haq for a follow up appointment. He

9

reported that his hypertension was "well controlled" and his bipolar disorder was "unchanged." Plaintiff noted that he had not been experiencing leg pain and swelling, which was new (R. 553, 575). Dr. Haq noted a normal examination and diagnosed diabetes mellitus, hyperlipidemia, hypertension, and bipolar I disorder single manic episode severe specified as with psychotic behavior. He prescribed Metformin, Lantus, and Apidra, increased Plaintiff's insulin, and instructed him to return in three (3) weeks (R. 554-55, 576-77).

Plaintiff saw Dr. Salman again on May 2, 2012. He reported that his depression and mood swings had increased; he had good and bad days. Plaintiff was cooperative and oriented as to all spheres. He had good eye contact and coordination. Plaintiff had no psychomotor retardation or agitation; he had no suicidal or homicidal thoughts. Plaintiff described his mood as "so so;" his affect was euthymic. Plaintiff had clear speech, appropriate thought content, and normal memory (R. 596).

Plaintiff returned to see Dr. Haq on May 7, 2012, for a follow up. Plaintiff had no serious hypoglycemia; his hypertension was well controlled; and his bipolar disorder was stable (R. 556, 578). Dr. Haq noted a normal examination and diagnosed diabetes mellitus, hyperlipidemia, hypertension, and bipolar I disorder single manic episode severe specified as with psychotic behavior. He prescribed Metformin and increased Plaintiff's insulin dosage (R. 557, 579). Plaintiff was to return in four (4) weeks (R. 558, 580).

On May 31, 2012, Plaintiff told Dr. Salman that he was starting to have "more good days." He had an "occasional" bad day. Plaintiff's blood sugars had decreased; he thought Buspar was helpful for decreasing his depression and anxiety. Plaintiff was cooperative and oriented as to all spheres. He had good eye contact and coordination. Plaintiff displayed no psychomotor retardation

and agitation; he had no suicidal or homicidal thoughts. He described his mood as "okay." Plaintiff's speech was clear, his thought content was appropriate, and his memory was normal. Dr. Salman diagnosed major depressive disorder and prescribed Buspar, Remeron, Abilify, Cymbalta, and folic acid (R. 595).

On July 2, 2012, Plaintiff had a follow up appointment with Dr. Haq. Again, he had no serious hypoglycemia; his hypertension was well controlled; and his bipolar disorder was unchanged (R. 559, 581). Dr. Haq noted a normal examination and diagnosed diabetes mellitus, hyperlipidemia, hypertension, and bipolar I disorder single manic episode severe specified as with psychotic behavior. He prescribed Apidra and Lantus and instructed Plaintiff to return in six (6) weeks (R. 560-61, 582-83).

Plaintiff told Dr. Salman, on July 6, 2012, that he was "about the same" with his depression. He had "more good days than bad." Plaintiff was out of bed more and participating in more activities. Dr. Salman noted that Plaintiff was cooperative and oriented as to all spheres. He had no psychomotor retardation or agitation; he had no suicidal or homicidal thoughts. Plaintiff described his mood as "not too bad;" his affect was euthymic. He had clear speech, appropriate thought content, and normal memory. Plaintiff thought that his medications were "helping." Dr. Salman diagnosed major depressive disorder and prescribed Buspar, Remeron, Abilify, Cymbalta, and folic acid (R. 594).

On August 3, 2012, Plaintiff saw Dr. Salman to change his medications. His depression had increased. Plaintiff stayed in bed two (2) or three (3) days per week. He had decreased energy and motivation; he did not feel like doing anything. Plaintiff had increased anhedonia. He was cooperative and oriented as to all spheres. On a good day, Plaintiff got eight (8) to ten (10) hours

of sleep; on a bad day he slept fifteen (15) hours or more. Dr. Salman noted good eye contact and coordination. Plaintiff had a "downcast appearance." He had no psychomotor retardation or agitation; he had no suicidal or homicidal thoughts. Plaintiff described his mood as "depressed;" his affect was sad. Plaintiff had clear and coherent speech, appropriate thought content, and normal memory. Dr. Salman diagnosed major depressive disorder and prescribed Buspar, Remeron, Abilify, Cymbalta, and folic acid. He increased Plaintiff's Buspar dosage and noted that his Cymbalta dosage may need to be increased. Plaintiff also needed to work on his adaptive coping skills for dealing with increases in depression (R. 593).

Plaintiff saw Dr. Haq again on August 27, 2012. His hypertension was well controlled; his hyperlipidemia was "ok;" his bipolar disorder was "ok;" and he had occasional hypoglycemia (R. 562, 584). Upon examination, Dr. Haq noted that Plaintiff had multiple lesions, about two (2) centimeters in diameter, on his arms and legs. He diagnosed diabetes mellitus, hyperlipidemia, hypertension, and bipolar I disorder single manic episode severe specified as with psychotic behavior. Dr. Haq prescribed Lantus and Apidra (R. 563, 585). Plaintiff was instructed to consult a dermatologist and to return in two (2) months (R. 564).

Plaintiff saw Dr. Salman again on August 31, 2012. His depression, anxiety, and racing thoughts had decreased; he had more energy and motivation; he had been "feeling better" since his last appointment. Plaintiff was cooperative and oriented as to all spheres. Dr. Salman noted good eye contact and coordination. Plaintiff displayed no signs of psychomotor retardation or agitation; he had no suicidal or homicidal thoughts. Plaintiff described his mood as "good;" his affect was euthymic. His speech was clear, his thought content was appropriate, and his memory was normal. Dr. Salman diagnosed major depressive disorder and prescribed Buspar, Remeron, Abilify,

Cymbalta, and folic acid (R. 592).

On September 28, 2012, Plaintiff told Dr. Salman that his depression was decreased, his energy level was "good," he was sleeping well, and had no complaints. Upon examination, Plaintiff was cooperative and oriented as to all spheres. He had no psychomotor retardation or agitation; he had no suicidal or homicidal thoughts. He described his mood as "good;" his affect was euthymic. Plaintiff's speech was clear, his thought content was appropriate, and he had normal memory. Dr. Salman diagnosed major depressive disorder and prescribed Buspar, Remeron, Abilify, Cymbalta, and folic acid. Plaintiff was "stable" on his current medications; he was to continue individual therapy (R. 591).

On November 26, 2012, Plaintiff saw Dr. Salman for a routine appointment. He was "doing well" and denied any changes in his mood. Upon examination, Dr. Salman noted that Plaintiff was cooperative and oriented as to all spheres. He displayed no signs of psychomotor retardation or agitation, and he had no suicidal or homicidal thoughts. Plaintiff described his mood as "good;" his affect was euthymic. He had clear speech, appropriate thought content, and normal memory. Dr. Salman diagnosed major depressive disorder and prescribed Buspar, Abilify, Remeron, and Cymbalta. He noted that Plaintiff was "stable" on his current medications (R. 590).

Plaintiff told Dr. Salman, on November 30, 2012, that he was "still doing well" but that he had experienced a "rough week." Plaintiff's brother in law had passed away, and Plaintiff had to put his cat to sleep. Upon examination, Dr. Salman noted that Plaintiff was cooperative and oriented as to all spheres. He did not display signs of psychomotor retardation or agitation, and he had no suicidal and homicidal thoughts. Plaintiff described his mood as "rough week;" his affect was euthymic. He had clear speech, normal memory, and appropriate thought content. Dr. Salman

diagnosed major depressive disorder and prescribed Buspar, Abilify, Cymbalta, Remeron, and folic acid. Plaintiff was instructed to return in three (3) weeks (R. 589).

On January 4, 2013, Plaintiff told Dr. Salman that he was experiencing depression and anxiety. His energy "could still be better," and he had "poor motivation." Plaintiff thought his medications were "helpful overall." Upon examination, Dr. Salman noted that Plaintiff was cooperative and oriented as to all spheres. There were no signs of psychomotor retardation or agitation, and Plaintiff had no suicidal and homicidal thoughts. Plaintiff described his mood as "ok;" his affect was constructed. He had clear speech and appropriate thought content. His memory was normal. Dr. Salman diagnosed major depressive disorder and continued him on his current medications (R. 588).

Plaintiff saw Dr. Salman on February 1, 2013. He was "doing well" and denied changes in his mood. Upon examination, Dr. Salman noted that Plaintiff had clear speech and was oriented as to all spheres. Plaintiff had good eye contact, was cooperative, and was getting adequate sleep. Dr. Salman noted no signs of psychomotor retardation or agitation. He diagnosed major depressive disorder and prescribed Cymbalta, Buspar, Remeron, and Abilify (R. 587).

On March 1, 2013, Plaintiff had an appointment with Dr. Salman. He was "still battling depression." Plaintiff brought disability paperwork for Dr. Salman to complete. Upon examination, Dr. Salman noted that Plaintiff had clear speech and was oriented as to all spheres. Plaintiff's mood was depressed; his affect was euthymic. He had good eye contact and was cooperative. Dr. Salman noted no signs of psychomotor retardation or agitation. He diagnosed major depressive disorder and prescribed Cymbalta, Buspar, Remeron, and Abilify (R. 586).

On March 4, 2013, Dr. David Currence completed a Physical Residual Functional Capacity

Assessment of Plaintiff. He noted that Plaintiff could frequently and occasionally lift and carry ten (10) pounds. Plaintiff could stand and walk for less than two (2) hours in an eight (8)-hour workday. He needed to "periodically alternate sitting and standing to relieve pain or discomfort." Plaintiff was limited in using his lower extremities for pushing and pulling because of muscle fatigue and peripheral diabetes (R. 620). Dr. Currence determined that Plaintiff was limited in handling, fingering, and feeling because of his peripheral neuropathy (R. 621). Plaintiff needed to avoid all exposure to extreme heat and cold and hazards and concentrated exposure to wetness, humidity, vibration, fumes, odors, dusts, gases, and poor ventilation (R. 622).[3]

Dr. Salman completed a Medical Source Statement (Mental) of Plaintiff on March 15, 2013. He determined that Plaintiff was mildly restricted in understanding and remembering short, simple instructions; carrying out short and simple instructions; and making simple work-related decisions. Dr. Salman found that Plaintiff was "moderately severe" in remembering locations and work-like procedures; understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods of time; performing activities within a schedule, maintaining regular attendance, and/or being punctual; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being distracted by them; and completing a normal workday and workweek without interruptions from psychological-based symptoms and performing at a consistent pace (R. 601). In the Social Interactions category, Plaintiff was mildly restricted in asking simple questions or requesting assistance; moderately restricted in maintaining socially appropriate behavior and adhering to basic

---

[3] The record contains some treatment notes from Dr. Currence; however, those treatment notes are illegible to the undersigned.

standards of neatness and cleanliness; and "moderately severe" in his ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism; and get along with coworkers or peers without distracting them or exhibiting behavior extremes. As to Adaptation, Plaintiff was moderately limited in being aware of normal hazards and taking appropriate precautions, and his abilities to travel in unfamiliar places or use public transportation and set realistic goals or make plans independently of others were "moderately severe." Dr. Salman diagnosed Plaintiff with bipolar disorder and noted that Plaintiff continued to suffer from depression (R. 602). He opined that Plaintiff's symptoms would last or could be expected to last for twelve (12) months, and that any physical stress could lead to the worsening of his functional status (R. 603). As to the medical findings that supported his assessment, Dr. Salman noted history of mood swings, depression, and suicidal ideation. Plaintiff's conditions would produce "good days" and "bad days." He would likely be absent from work more than four (4) times per month because of his impairments (R. 604).

Dr. Salman completed a Psychiatric Review Technique of Plaintiff on March 18, 2013. Plaintiff suffered from a depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; and hallucinations, delusions, or paranoid thinking (R. 608). Plaintiff also had an anxiety-related disorder characterized by persistent fear of a specific object, activity, or situation, and by recurrent and intrusive recollections of a traumatic experience (R. 610). Dr. Salman determined that Plaintiff was markedly impaired in his activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. He noted

that Plaintiff had experienced three (3) episodes of decompensation (R. 615). Dr. Salman found that Plaintiff met the "C" criteria under Listing 12.04 because of repeated episodes of decompensation (R. 616).

Administrative Hearing

At the administrative hearing, Plaintiff testified that he worked as a custodian for Barbour County, West Virginia, from 1998 through 2009. During the summers, he worked as a groundskeeper (R. 44). Plaintiff quit working because of his feet and his mental state (R. 45). When asked to clarify what he meant about his mental state, Plaintiff stated that he had a "hard problem with being around people." He would get away from people at work by going into the room where custodial supplies were kept. Plaintiff did not feel "good" around the holidays; he did not like to be around family because of his anxiety (R. 46).

If Plaintiff began to feel anxious while at home, he would lie in bed. Sometimes, he did that all day; he felt like that two (2) to three (3) days a week. Plaintiff had trouble walking on uneven ground and in fields because he could not feel what was underneath his feet "a lot of times;" he could stay on his feet a "couple hours a day." His feet hurt "real bad" and began to swell if he was on them for more than two (2) hours per day. If Plaintiff's feet began to swell, he would either lie down or sit in a chair for the rest of the day (R. 47).

On a good day, Plaintiff watched television "on and off" for eight (8) hours a day (R. 47). He did not follow television programs that well because of his "attention span." A good day for Plaintiff involved getting up, taking a shower, watching television, and "maybe go[ing] out on the porch and sit[ting] on the porch or go[ing] to the grocery store." On a bad day, Plaintiff stayed in bed all day; he had bad days two (2) or three (3) times per week. Plaintiff usually took fifteen (15)

to twenty (20) minutes in the grocery store (R. 48). If he was in the store longer than that, his feet began to hurt (R. 48-49).

Plaintiff had diabetes; they made him feel "sort of embarrassed, because of the way [his] arms" were. He had lesions on his arms; he picked at those lesions but often did not realize he was doing so (R. 49). Plaintiff's osteoarthritis cased him to have trouble with "bending over and straightening up." He could lift "light stuff" or anything less than five (5) pounds on a regular basis. He "probably" could lift things weighing ten (10) pounds (R. 50). Plaintiff had to be careful picking up things, like cans of soda, because of the feeling in his hands; if he was not careful, he would drop items. He got tired every day because of his "mental capacity;" he did not do any activities. Plaintiff attended church; where he "mostly just s[at] and listen[ed]" (R. 51). He did not have "any desire to be in any other clubs or anything where it's dealing with a lot of people" (R. 52). Plaintiff tested his blood sugar five (5) or six (6) times a day; he adjusted his insulin dosage based on his readings. Plaintiff followed his diabetic diet (R. 53).

The ALJ then asked the VE the following hypothetical:

If we assume an individual of the same age, education, and work background as the claimant, is capable of performing sedentary work as defined in the regulations with the following limitations: There should be no crouching, no crawling, no climbing of ladders, ropes or scaffolds, no more than occasional balancing, stooping, or climbing up stairs or ramps, there should be no concentrated exposure to extreme heat and cold or vibration, the person must avoid even moderate exposure to hazards, such as dangerous moving machinery or unprotected heights. The work should be limited to simple, routine and repetitive instructions and tasks. Those tasks should be performed in a low-stress setting, which I'll define as requiring no assembly line, no fast-paced production requirements, no more than occasional changes in work routine or work setting, and little independent decision-making or goal setting. There should be no contact with the public, no more than occasional interaction with co-workers or supervisors, and once work is assigned, it should be able to be performed primarily without working in coordination with other employees. Would such a person be able to perform the claimant's past work?

The VE responded that such an individual could not perform Plaintiff's past work, but could perform work as a machine tender, with 140,000 jobs nationally and 1,375 regionally; or as a general sorter, with 49,500 jobs nationally and 500 regionally (R. 55-56).

> The ALJ then asked the VE:
>
> Now if I added an additional restriction that there should be no more than frequent use of the hands for handling or gross manipulation, would that affect the performance of either of these two jobs?

The VE responded that such an individual could still perform work as a machine tender or general sorter (R. 56-57). The ALJ then asked:

> Now if that restriction were further limited to occasional, obviously, that would eliminate these two jobs. Would there be any occupations that such an individual could perform with occasional handling at the sedentary level with the other restrictions?

The VE responded that there were no such occupations (R. 57).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Carpenter made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act at least through December 31, 2014. (Exhibit B3D).

2.  The claimant has not engaged in substantial gainful activity since June 14, 2011, the date after the prior hearing decision. (Exhibit B3D). (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: diabetes mellitus; diabetic neuropathy; obesity; hypertension; and bipolar disorder/major depressive disorder (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,

and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with the following limitations: no crouching, crawling, or climbing of ladders/ropes/scaffolds and no more than occasional performance of balancing, stooping, or climbing of stairs or ramps; no concentrated exposure to heat, cold, and vibration; must avoid even moderate exposure to hazards such as dangerous moving machinery or unprotected heights; entails only simple, routine, and repetitive instructions and tasks; work must be performed in a low stress setting, defined as requiring no assembly line, no fast paced production requirements, no more than occasional changes in work routine or work setting, and little independent decision making or goal setting; no contact with the public and no more than occasional interaction with co-workers and supervisors; and once work is assigned, work should be able to be performed primarily without working in coordination with others.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on April 23, 1964 and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 14, 2011, through the date of this decision (20 CFR 404.1520(g)).

(R. at 14-29.)

# IV. DISCUSSION

**A.     Scope of Review**

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays v. Sullivan, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**B.     Contentions of the Parties**

Plaintiff contends:

1.      Because the ALJ gave no clear weight to the credibility she gave Mr. Phillips then this Court must find the ALJ violated SSR 96-7p and remand in order

to allow the ALJ to provide a proper credibility analysis;

2. Because the ALJ ignored testimony and used her own interpretation of medical terms contrary to SSR 96-2p, then the ALJ's discount of Dr. Salman's opinion is not supported by substantial evidence; and

3. Because the ALJ treats evidence from before the relevant time period differently and because the ALJ did not review the psychological evidence in the same light as the physical evidence, then this Court must remand this claim as the ALJ is not providing Mr. Phillips with due process as the ALJ is providing different standards of review for similar evidence.

(Plaintiff's Brief at 5-14.)

The Commissioner contends:

1. The ALJ properly evaluated the credibility of Plaintiff's subjective complaints;

2. The ALJ properly evaluated the opinion of Plaintiff's treating psychiatrist; and

3. The ALJ properly and consistently considered the medical evidence from the relevant period.

(Defendant's Brief at 8-14.)

**C.      Credibility**

Plaintiff first argues that the "ALJ did not provide a sufficient credibility analysis under Social Security Ruling 96-7p," leaving to speculation "as to what amount of credibility ALJ Carpenter gave [him]." (Plaintiff's Brief at 5.) According to Plaintiff, the ALJ gave him a "'sliding scale'" of credibility, and that "according to the ALJ's analysis, on one hand, [he was] credible when his statements can be used to discount the opinion of a treating psychiatrist . . . yet, on the other hand [his] subjective statements at the hearing undermine his credibility." (Id. at 6.)

The ALJ has a "'duty of explanation' when making determinations about credibility of the

claimant's testimony." Smith v. Heckler, 782 F.2d 1176, 1181 (4th Cir. 1986) (citing DeLoatche v. Heckler, 715 F.2d 148, 150-51 (4th Cir. 1983)); see also Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985). The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). This Court has noted that "[a]n ALJ's credibility determinations are 'virtually unreviewable.'" Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011) (Stamp, J.). If the ALJ meets his basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010 (Seibert, Mag. J.) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

In Craig v. Chater, 76 F.3d 585 (4th Cir. 1996), the Fourth Circuit developed a two-step process for determining whether a person is disabled by pain or other symptoms. That process is as follows:

> First, there must be objective medical evidence showing "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and *which could reasonably be expected to produce the pain or other symptoms alleged*." . . . Therefore, for pain to be found disabling, there *must* be show a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce" the actual pain, in the amount and degree, alleged by the claimant.
>
> . . .
>
> It is only *after* a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed,

that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated. . . . Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings . . .; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.) . . .; and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it . . . .

Id. at 594-95 (internal citations omitted). An ALJ "will not reject [a claimant's] statements about the intensity and persistence of . . . pain or other symptoms or about the effect [those] symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2) (alterations in original). Social Security Ruling ("SSR") 96-7p sets out some of the factors used to assess the credibility of an individual's subjective allegations of pain, including:

1.  The individual's daily activities;

2.  The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.  Factors that precipitate and aggravate the symptoms;

4.  The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.  Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.  Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The determination or decision "must contain

specific enough reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." Id. at *2.

As to Plaintiff's credibility, the ALJ stated:

> In conjunction with his current application for disability benefits, the claimant has alleged rheumatoid arthritis, diabetes, and depression have limited his ability to sustain consistent employment since June 11, 2009. (Exhibit B4E2). In a July 26, 2011 Adult Function Report, the claimant asserted that arthritis pain in his feet/hands and depression limited his ability to work. The claimant also reported that his impairments affected his ability to lift, squat, stand, walk, kneel, remember, complete tasks, concentrate, understand, follow instructions, utilize his hands, and get along with others. (Exhibit B5E). In a December 3, 2011 Adult Function Report, the claimant asserted that arthritis and depression have limited his ability to sustain consistent employment. The claimant further asserted that his impairments affected his ability to lift, squat, walk, sit, kneel, remember, concentrate, and utilize his hands. (Exhibit B9E8). At the April 2013 disability hearing, the claimant continued to assert compensable disability status as a result of diabetes, peripheral neuropathy, and depression/anxiety. However, the credibility of the claimant's subjective allegations are [sic] undermined for a number of reasons.

(R. at 19.)

As an initial matter, Plaintiff argues that "the ALJ's decision makes no specific indication as to what level of credibility the ALJ gave [him]." (Plaintiff's Brief at 5.) He further argues that the "ALJ does not indicate that she compared [his] statements against the objective evidence in the record as required by SSR 96-7p," and "does not indicate that she compared [his] statements against the entire case record in the absence of objective evidence." (Id. at 5-6.) The undersigned disagrees with Plaintiff. By using the term "undermined," the ALJ clearly expressed her belief that Plaintiff was not credible. Plaintiff appears to suggest that ALJs must fashion their credibility determinations using specific language. However, Plaintiff had not provided, and the undersigned has not discovered, any case that supports such a proposition.

25

In any event, a review of the record reveals that the ALJ complied with both <u>Craig</u> and SSR

96-7p. The ALJ discussed Plaintiff's daily activities as follows:

> Finally, along with the aforementioned, the full longitudinal record of evidence readily demonstrates that the claimant's allegations of the disabling nature of his alleged impairments are significantly undermined by his daily activities. The claimant's activities do not comport with a person who is totally disabled. More specifically, in a July 26, 2011 Adult Function report, the claimant reported that during his typical day he was able to provide care for one of his cats, watch television, and read the newspaper. Further, he indicated that he had no problem with his personal care, prepared his own meals, and mowed his lawn on a tractor. The claimant also reported that he was able to drive an automobile and shop in stores. He further indicated that he was able to attend church on a regular basis. (Exhibit B5E). In a December 3, 2011 Adult Function Report, the claimant reported that during his typical day he cared for his cats, took his medication, and watched television. Further, he indicated that he was able to maintain his own personal care, prepare his own meals, and mow his own yard with a riding lawn mower. The claimant also reported that he was able to drive an automobile and shops stores. Moreover, the claimant reported that he spent time with others, including spending time with his wife. He also indicated that he went out for dinner at restaurants and attended church on a regular basis. (Exhibit B9E). Further, at the April 2013 disability hearing, the claimant reported that on good days, he will shop for groceries. Overall, in light of the aforementioned, the undersigned finds the above Residual Functional Capacity to be justified.

(R. at 27.)

The ALJ also provided a thorough, eight (8)-page discussion of Plaintiff's treatment history,

which included a discussion of the medical evidence that was inconsistent with Plaintiff's subjective

complaints. (R. at 19-27.) For example, as to Plaintiff's medical impairments, the ALJ wrote in

relevant part:

> On September 22, 2011, the claimant complained to Bennett D. Orvik, M.D., of depression, osteoarthritis, diabetes mellitus, and arthritis in the hands and feet. Upon examination, the claimant had multiple old scares where he has had infected areas with diabetes on his arms and his legs. Further, the claimant's pulses were normal in radial, brachial, and pedal areas bilaterally. The claimant further reported having some numbness of both of his feet, but his motor strength bilaterally in the upper and lower extremities was reported as being five out of five. Further, the claimant had

faint to absent deep tendon reflexes in his knees and ankles bilaterally. His straight leg raising in the supine and sitting position was normal bilaterally. The claimant's grip strength was also reportedly mildly decreased on grade 4/5. With regards to the claimant's lumbar spine, his range of motion did appear to be normal, and there were no areas of joint inflammation, tenderness, swelling, or deformity. This practitioner also indicated that the claimant's gait showed a slight left-sided limp. As a result of the aforesaid examination, Dr. Orvik diagnosed the claimant with "Insulin-dependent diabetes mellitus," "Diabetic neuropathy," "Depression," "Osteoarthritis," "Exogenous obesity," "Hypertension," and "Hyperlipidemia." . . .

On September 29, 2011, Dr. Currence reported that the claimant's joints, extremities, neurological system, and peripheral pulses were normal. (Exhibit B25F7). On February 6, 2012, Dr. Currence noted the claimant to have non-insulin dependent diabetes mellitus, depression, a history of stroke, and hypertension. On this date, the claimant's joints, extremities, neurological system, and peripheral pulses were reported as normal. (Exhibit B25F9-10). On April 4, 2012, Syad Haq, M.D., reported that the claimant's hypertension was well controlled. This doctor further reported that the claimant's Bipolar I disorder was unchanged. Further, the claimant denied any chest pain, shortness of breath, or dyspnea on exertion. The claimant had no leg swelling or pain. After an examination, Dr. Haq diagnosed the claimant with diabetes mellitus without mention of complication, hyperlipidemia, hypertension, and Bipolar I Disorder. (Exhibit B21F1-3). On April 18, 2012, Dr. Haq reported the claimant to have no serious hypoglycemia and that his hypertension was reported as well controlled. The claimant denied having chest pain, shortness of breath, or dyspnea on exertion. Further, the claimant had no leg swelling or pain. On this date, Dr. Haq diagnosed the claimant with diabetes mellitus, hyperlipidemia, hypertension, and Bipolar I Disorder. (Exhibit B21F6-8). On May 7, 2012, Dr. Haq reported the claimant to have no serious hypoglycemia. Further, this doctor reported that the claimant's mental condition was stable. This practitioner further increased the claimant's insulin. (Exhibit B21F9-11). One day later, Dr. Currence reported that the claimant's joints, extremities, neurological system, and peripheral pulses were normal. (Exhibit B25F1-12).

On July 2, 2012, Dr. Haq reported again that the claimant had no serious hypoglycemia. Further, the claimant's mental condition was reported as unchanged. Dr. Haq further indicated that the claimant's diabetes mellitus was uncontrolled but improving. (Exhibit B21F12-14). On August 27, 2012, Dr. Haq reported that the claimant had occasional hypoglycemia. Further, the claimant's Bipolar I Disorder was reported as being okay. (Exhibit B21F15-17). On September 13, 2012, Dr. Currence again reported that the claimant's joints, extremities, neurological system, and peripheral pulses were normal.

(R. at 20-21.) The ALJ also provided a thorough, three (3)-page discussion of the objective medical

evidence concerning Plaintiff's mental impairments. (R. at 23-26.) The undersigned has discussed such evidence below, in Section IV.D, and so will not repeat it here.

In sum, the undersigned finds that the ALJ complied with <u>Craig</u> and SSR 96-7p when assessing Plaintiff's credibility. First, by using the term "undermined," the ALJ expressed her decision that Plaintiff was not credible; there is no support for the proposition that she was required to state her decision using specific language. Furthermore, the ALJ discussed Plaintiff's daily activities, treatment history, and the objective medical evidence from the relevant period. Accordingly, the undersigned finds that substantial evidence supports the ALJ's credibility determination, and Plaintiff's claim is without merit.

## D.     Treating Psychiatrist's Opinion

As his second claim for relief, Plaintiff asserts that the ALJ's "discount of Dr. Salman's opinion is not supported by substantial evidence." (Plaintiff's Brief at 9.) Specifically, Plaintiff claims that "Dr. Salman's opinion is entirely consistent with [his] statements and vice versa," and that the ALJ's discount of Dr. Salman's opinion is "based on the ALJ's own interpretations of medical evidence." (<u>Id.</u> at 9, 12.)

20 C.F.R. § 404.1527(c) states:

> *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> > (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to

be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (I) *Length of the treatment relationship and the frequency of examination.*  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*.  The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship

with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization.* We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors.* When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

Likewise, 20 C.F.R. § 404.1527(f)(2)(I) provides:

Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence except for the ultimate determination about whether you are disabled.

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it."

Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of

the patient's condition over a prolonged period of time." <u>Mitchell v. Schweiker</u>, 699 F.2d 185, 187

(4th Cir. 1983). In <u>Craig</u>, however, the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
> > [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>
> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

76 F.3d at 590. Furthermore, "[n]either the opinion of a treating physician nor the determination of

another governmental entity are binding on the Secretary." <u>DeLoatch v. Heckler</u>, 715 F.2d 148, 150

n.1 (4th Cir. 1983).

    The Fourth Circuit has also noted that a court "cannot determine if findings are supported

by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant

evidence." <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235 (4th Cir. 1984). Indeed, "[u]nless the Secretary

has analyzed all evidence and has sufficiently explained the weight he has given to obviously

probative exhibits, to say that his decision is supported by substantial evidence approaches an

abdication of the court's 'duty to scrutinize the record as a whole to determine whether the

conclusions reached are rational.'" <u>Arnold v. Sec'y of Health, Ed. & Welfare</u>, 567 F.2d 258, 259 (4th

Cir. 1977). The Administration has discussed the explanation of the weight to be given to a treating

source's medical opinion, as follows:

Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will

always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:

When the determination or decision:

*is not fully favorable, e.g., is a denial; or

*is fully favorable based in part on a treating source's medical opinion, e.g., when the adjudicator adopts a treating source's opinion about the individual's remaining ability to function;

the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). "[W]hen a physician offers specific restrictions or limitations . . . the ALJ must provide reasons for accepting or rejecting such opinions." Trimmer v. Astrue, No. 3:10CV639, 2011 WL 4589998, at *4 (E.D. Va. Sept. 27, 2011), aff'd by 2011 WL 4574365 (E.D. VA. Sept. 30, 2011). A logical nexus must exist between the weight accorded to opinion evidence and the record, and the reasons for assigning such weight must be "sufficiently articulated to permit meaningful judicial review." DeLoatch, 715 F.2d at 150.

Regarding Dr. Salman's opinion, the ALJ wrote:

In finding the above, the Administrative Law Judge has fully considered all medical opinions of record. On December 13, 2011, Dr. Salman opined that the claimant was unable to work gainful employment due to his disability. (Exhibit B16F2). On March 15, 2013, Dr. Salman opined that the claimant was [sic] miss more than four days from work per month due to his condition. This practitioner further opined that the claimant had mostly "Moderately Severe" limitations in the facets of understanding/memory, sustained concentration/persistence, social interactions, and adaptation. This doctor also noted the claimant to have a diagnosis of Bipolar disorder. (Exhibit B23F). Ultimately, the Administrative Law Judge has accorded the findings and conclusions of Dr. Salman limited weight due to such being inconsistent with the full longitudinal record in a number of ways. First, as

discussed above, the claimant's treatment history with Dr. Salman is replete with periods of mental health stabilization and improvement. Such periods are inconsistent with a complete inability to engage in work activity for a continuous period of 12 month [sic] and the "Moderately Severe" limitations ascribed for by this doctor. Further, as noted above, while finding the claimant to have moderately severe limitations as to facets of understanding/memory, Dr. Salman observed the claimant on numerous occasions . . . to have a normal memory. Finally, such findings are inconsistent with the claimant's reported social functioning and activities of daily living as articulated upon in Adult Function Reports. (See Exhibits B5E and B9E).

(R. at 26.)

Dr. Salman completed a Medical Source Statement (Mental) of Plaintiff on March 15, 2013. He determined that Plaintiff was mildly restricted in understanding and remembering short, simple instructions; carrying out short and simple instructions; and making simple work-related decisions. Dr. Salman found that Plaintiff was "moderately severe" in remembering locations and work-like procedures; understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods of time; performing activities within a schedule, maintaining regular attendance, and/or being punctual; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being distracted by them; and completing a normal workday and workweek without interruptions from psychological based symptoms and performing at a consistent pace (R. 601). In the Social Interactions category, Plaintiff was mildly restricted in asking simple questions or requesting assistance; moderately restricted in maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; and "moderately severe" in his ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism; and get along with coworkers or peers without distracting them or exhibiting behavior extremes. As to Adaptation,

Plaintiff was moderately limited in being aware of normal hazards and taking appropriate precautions, and his abilities to travel in unfamiliar places or use public transportation and set realistic goals or make plans independently of others were "moderately severe." Dr. Salman diagnosed Plaintiff with bipolar disorder and noted that Plaintiff continued to suffer from depression (R. 602). He opined that Plaintiff's symptoms would last or could be expected to last for twelve (12) months, and that any physical stress could lead to the worsening of his functional status (R. 603). As to the medical findings that supported his assessment, Dr. Salman noted history of mood swings, depression, and suicidal ideation. Plaintiff's conditions would produce "good days" and "bad days." He would likely be absent from work more than four (4) times per month because of his impairments (R. 604).

Dr. Salman completed a Psychiatric Review Technique of Plaintiff on March 18, 2013. Plaintiff suffered from a depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; and hallucinations, delusions, or paranoid thinking (R. 608). Plaintiff also had an anxiety-related disorder characterized by persistent fear of a specific object, activity, or situation, and by recurrent and intrusive recollections of a traumatic experience (R. 610). Dr. Salman determined that Plaintiff was markedly impaired in his activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. He noted that Plaintiff had experienced three (3) episodes of decompensation (R. 615). Dr. Salman found that Plaintiff met the "C" criteria under Listing 12.04 because of repeated episodes of decompensation (R. 616).

The ALJ correctly determined that Dr. Salman's opinion was inconsistent with the longitudinal record, including Dr. Salman's own treatment notes. For example, on June 20, 2011, Plaintiff told Dr. Salman that his medications were "working well" and that his mood was "good." Dr. Salman noted that Plaintiff had a euthymic affect, normal memory, and no psychomotor retardation or agitation. (R. at 476.) On September 19, 2011, when Plaintiff saw Dr. Salman for a medication change, Dr. Salman noted that although Plaintiff had a sad affect, he demonstrated normal memory and appropriate thought content. (R. at 521.) Approximately a month later, on October 17, 2011, Dr. Salman noted a euthymic affect and normal memory. Furthermore, Plaintiff's suicidal thoughts had decreased after his Cymbalta dosage had been decreased. (R. at 520.)

When Plaintiff saw Dr. Salman on January 11, 2012, he reported that his mood had improved since his last appointment. Dr. Salman noted that Plaintiff had a euthymic mood and had some impairment to his short term memory. (R. at 517, 600.) On February 8, 2012, Dr. Salman again noted that Plaintiff had a euthymic affect, normal memory, and appropriate thought content. (R. at 599.) On May 31, 2012, Plaintiff told Dr. Salman that he was starting to have "more good days," but still had an "occasional" bad day. Dr. Salman noted that Plaintiff had a normal memory and appropriate thought content. (R. at 595.) Dr. Salman found the same on July 6, 2012, when Plaintiff informed him that he had "more good days than bad." (R. at 594.)

On August 3, 2012, Plaintiff saw Dr. Salman for a medication change. At that time, Plaintiff had decreased energy and motivation. He had experienced an increase in depression. Dr. Salman noted that Plaintiff had appropriate thought content and normal memory. He increased Plaintiff's Buspar dosage and noted that his Cymbalta dosage may need to be increased. (R. at 593.) When Plaintiff returned on August 31, 2012, he reported that his depression and anxiety had decreased; he

had more energy and motivation; and he had been "feeling better" since his last appointment. Dr. Salman noted that Plaintiff had no signs of psychomotor retardation or agitation; he had a euthymic affect and normal memory. (R. at 592.) Dr. Salman noted the same on September 28, November 26, and November 30, 2012. (R. at 589, 590, 591.) On January 4, 2013, Plaintiff told Dr. Salman that he was experiencing depression and anxiety, but that he thought his medications were "helpful overall." Dr. Salman found no signs of psychomotor retardation or agitation, and Plaintiff had normal memory and appropriate thought content. (R. at 588.) On February 1, 2013, Dr. Salman noted that Plaintiff had no signs of psychomotor retardation or agitation. (R. at 587.) On March 1, 2013, he again noted that Plaintiff had no signs of psychomotor retardation or agitation. (R. at 586.)

Upon review of the record, it is clear that Dr. Salman's opinion was inconsistent with his own treatment notes. For example, in his Medical Source Statement (Mental) completed on March 15, 2013, Dr. Salman found that Plaintiff was "moderately severe" in his ability to remember instructions and procedures, maintain attention and concentration, and sustain a routine. However, Dr. Salman never mentioned in his treatment notes that Plaintiff's memory was "moderately severe." Furthermore, in his Psychiatric Review Technique completed on March 18, 2013, Dr. Salman found that Plaintiff suffered from a depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; and hallucinations, delusions, or paranoid thinking. (R. at 608.) However, several of these findings have no support from his treatment notes during the relevant period. At no time did Dr. Salman find that Plaintiff displayed appetite disturbance; psychomotor agitation or retardation; and hallucinations, delusions, or paranoid thinking. While

Plaintiff did express "passive" suicidal ideations on September 19, 2011 (R. at 521), on October 17, 2011, he told Dr. Salman that those thoughts had decreased after his Cymbalta dosage was decreased (R. at 520). Additionally, Dr. Salman's opinion that Plaintiff had an anxiety-related disorder characterized by persistent fear of a specific object, activity, or situation, and by recurrent and intrusive recollections of a traumatic experience, is completely unsupported by his treatment notes from the relevant period. Finally, although Dr. Salman opined that Plaintiff had experienced three (3) episodes of decompensation (R. at 616), the record is silent as to any episodes of decompensation during the relevant period.

As noted above, Dr. Salman found that markedly impaired in his activities of daily living and maintaining social functioning. (R. at 615.) However, in an Adult Function Report completed by Plaintiff on July 26, 2011, Plaintiff reported that he takes care of two (2) cats by giving them food and water and providing insulin to one. He had no problems with personal care. (R. at 207.) Plaintiff could prepare his own meals, and he mowed the lawn once a week. (R. at 208.) He could drive a car and go out alone, and he shopped for groceries once a week. (R. at 209.) Plaintiff attended church weekly. (R. at 210.) On December 3, 2011, Plaintiff completed another Adult Function Report. In this report, Plaintiff added that he spent time with others by going to the movies, restaurants, and church. (R. at 226.) Accordingly, the ALJ properly assigned limited weight to Dr. Salman's opinion given that it was inconsistent with Plaintiff's Adult Function Reports.

In sum, the ALJ properly assigned limited weight to Dr. Salman's opinion. Not only was Dr. Salman's opinion inconsistent with his own treatment notes, but it was also inconsistent with the two Adult Function Reports prepared by Plaintiff. Accordingly, substantial evidence supports the ALJ's treatment of Dr. Salman's opinion, and Plaintiff's argument is without merit.

## E.     Consideration of Medical Evidence

As his last claim for relief, Plaintiff contends that the ALJ "arbitrarily used terms such as 'stable' and 'improvement' (and other similar terms) to bolster her belief that [his] mental condition has not worsened," but "fully accepts that [his] physical medical problems have worsened and are *more severe* than found by state agency doctors." (Plaintiff's Brief at 12.) According to Plaintiff, the ALJ denied him equal protection of the law because she was "willing to give [him] the utmost benefit of the doubt regarding the limitations posed by his physical issues," but was "not willing to give [him] the utmost benefit of the doubt regarding the limitations of his mental conditions." (Id. at 14.)

Upon review of the record, the undersigned finds that the ALJ did not based her conclusion that Plaintiff had greater physical functional limitations than found in the prior ALJ's decision on treatment notes containing the words "stable," "improvement," etc. Rather, the ALJ explicitly stated: "Overall, in light of the electrodiagnostic studies revealing the claimant to have significant diabetic neuropathy, the undersigned has restricted the claimant to greater physical limitations than ascribed for in the prior hearing decision." (R. at 20.) In support of this decision, the ALJ referred to the electrodiagnostic studies done by Dr. Khan on May 18, 2011, which revealed that Plaintiff has "severe neuropathy in the lower extremities suggestive of diabetic neuropathy." (Id.) She also referred to the consultative examination performed by Dr. Orvik on September 22, 2011, where Plaintiff was again diagnosed with diabetic neuropathy. (Id.) The ALJ also agreed with Dr. Currence's opinion that peripheral neuropathy affected Plaintiff's feet and caused him to be "limited in pushing and pulling as to the lower extremities." (R. at 22.)

Furthermore, Plaintiff incorrectly states that the "ALJ found [his] psychological condition

to be the same as it was at the prior ALJ decision." (Plaintiff's Brief at 13.)  Granted, the ALJ did

state that "the aforementioned noted periods of mental health improvement fail to necessitate a

significant deviation from the mental limitations found in the prior Administrative Law Judge

decision." (R. at 26.)  Nevertheless, whereas the prior ALJ defined a low stress environment as

"having only occasional decision making required, and only occasional changes in the work setting

which also requires no more than occasional interaction with the public, supervisor(s), and co-

workers" (R. at 95), ALJ Carpenter expanded the definition to require "no assembly line, no fast

paced production requirements, no more than occasional changes in work routine or work setting,

and little independent decision making or goal setting" (R. at 19).  ALJ Carpenter's RFC

determination also precluded "contact with the public" and required that "once work is assigned,

work should be able to be performed primarily without working in coordination with others." (R.

at 19.)

In sum, Plaintiff's argument is without merit.  The ALJ based her decision conclusion that

Plaintiff had greater physical limitations on studies that revealed significant diabetic neuropathy, not

treatment notes using terms such as "stable" and "improvement."  Furthermore, the ALJ assigned

greater mental limitations than those found by the prior ALJ.  Nothing in the record remotely

suggests that the ALJ failed to provide equal protection of the law to Plaintiff, and so Plaintiff's

claim must be denied.

## V.  RECOMMENDED DECISION

For the reasons stated above, I find that the Commissioner's decision denying the Plaintiff's

application for DIB is supported by substantial evidence.  I accordingly recommend the Defendant's

Motion for Summary Judgment be **GRANTED**, and the Plaintiff's Motion for Summary Judgment

be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide an electronic copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _6_ day of _February_ , 2015.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE